In re Kyle A. SMITH, Debtor.

ST. LUKE'S HOSPITALS OF FARGO, INC., a North Dakota corporation, Plaintiff,

v.

Kyle SMITH and Michael Farrell as Trustee of the Kyle Smith Bankruptcy Estate, Defendants.

Bankruptcy No. 89–05842.
Adv. No. 90–7001.

United States Bankruptcy Court, D. North Dakota.

May 16, 1990.

Brad A. Sinclair, Fargo, N.D., for St. Luke's Hosp.

Dean A. Rindy, West Fargo, N.D., for Kyle A. Smith.

Lowell P. Bottrell, Fargo, N.D., for Michael Farrell.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding arises by Complaint of St. Luke's Hospitals of Fargo, Inc. (Hospital) seeking recovery of unpaid medical expenses incurred by the Debtor.

Advancing a plethora of theories, the Hospital first of all claims it has a perfected hospital lien in insurance settlement proceeds unaffected by the event of bankruptcy or exemption claim. In five separate causes of action, nondischargeability of the medical expense debt itself is premised upon sections 523(a)(2)(A), 523(a)(4) and section 523(a)(6). The Hospital also asks that the Debtor be denied a discharge pursuant to section 727(a)(2)(A) and (a)(4)(C).

This case is companion to main file objections made by the Hospital and other creditors as regards the legitimacy of the Debtor's exemptions. Those objections were heard in February 1990 resulting in this court making detailed findings of fact and law regarding the issue of fraudulent intent in the context of pre-bankruptcy planning. The court in its Memorandum entered March 19, 1990, specifically declined discussion of the hospital lien and what impact, if any, it might have. The instant adversary proceeding came on for trial on April 24, 1990. To avoid needless duplication of effort, the court accepted as evidence in this case all evidence produced at the previous exemption objection hearing plus additional pieces of documentary evidence not previously introduced.

Although the facts as recited in the court's Memorandum of March 19, 1990, are for the most part relevant to the issues of this adversary, there are certain additional facts which are relevant and others which need emphasis. Hence, the findings of fact set forth below, while not at vari-

ance with those set out in the exemption opinion, do contain additional facts deemed relevant.

### Findings of Fact

1.

Kyle Smith is a single person presently 25 years of age who, lacking a high school diploma, has been employed in a series of menial jobs earning just over minimum wage. His income has been less than $5,000.00 in past years and at the time of injury discussed below, he was earning $4.40 per hour from his employment in a custom cabinet shop. On April 24, 1989, he sustained serious injuries when the motorcycle he was operating was struck by a pickup truck owned by David Ahlberg and operated by Kathryn Ahlberg. He was immediately transported to St. Luke's emergency and thereafter remained hospitalized until June 9, 1989. Upon his release he continued to receive outpatient treatment until September 7, 1989. In consequence of the services rendered by the hospital and clinic, Kyle incurred medical bills of $57,298.98 in the aggregate. St. Luke's bill for which it claims a hospital lien totals $48,057.00. Kyle returned to his former employment in early September 1989, but was assigned lesser responsibilities. Finally, he was laid off in January 1990, because the production manager felt he lacked adequate motor skills with which to do his job safely. He is presently employed as a pizza delivery man for $4.00 per hour.

Kyle's personal injury claim was settled by payment to him of policy limits by the Ahlberg's insurance carrier, National Farmers Union. Ninety thousand dollars of the One hundred thousand dollar settlement was used to purchase an annuity policy under which the Debtor is to receive $728.00 per month commencing December 1, 1990. The annuity became effective on August 28, 1989, with payments continuing for life and guaranteed for twenty years.

A petition for relief under Chapter 7 of the Bankruptcy Code was filed on November 1, 1989. Virtually all scheduled unsecured claims stem from the motorcycle accident including the claims of the medical providers, none of whom have been paid.

2.

Upon admission to the hospital Kyle, in addition to skeletal injuries, exhibited significant cognitive deficits, which caused his father, Leroy Smith, with whom he was living at the time, to consult with Attorney Ralph R. Erickson on May 2, 1989. They discussed Kyle's disability and the probable necessity of a guardianship. Leroy petitioned the county court for appointment of himself and Kyle's mother, Roberta Clark, as temporary co-guardians on May 3, 1989, and on June 8, 1989, the county court entered an order appointing them temporary guardians and conservators of his person and estate. Within the appointment order it provides that "any and all major decisions relative to the management of Kyle A. Smith's property or affairs including any decisions based upon his physical illness or disability shall be jointly made between Leroy E. Smith and Roberta Clark." The appointment order recognized that the only appreciable asset Kyle has was a chose in action arising out of the motorcycle accident and provided there could be no settlement without court approval.

Prior to meeting with Attorney Erickson, Leroy had met at the hospital with Ron Ehley, a claims adjuster for National Farmers Union, who had made an investigation of the accident and the extent of insurance limits. They talked about medical bills and the adjuster told Leroy that the way it looked they were very much in to the policy limits. Leroy asked him about payment of the hospital bills and was advised by Ehley that the company generally pays directly to the insured who, in turn, is left to deal with the hospital. Attorney Erickson called Ehley on May 5th advising him of his involvement in the case and further telling him not to pay any hospital bills. Erickson had by then concluded, as had Ehley, that it was a policy limits case.

Ehley knew Kyle was a patient at the hospital when he received a loss report on April 26, 1989, just several days after the accident. He apprised both David and Kathryn Ahlberg by letter of May 19, 1989,

that Kyle was in the hospital with severe injuries possibly of a value in excess of policy limits and that he would be in the hospital for some time.

By late April or the early part of May 1989 Kyle became aware he was in the hospital receiving treatment for his injuries. He testified that he might have died without the medical services provided.

In June, Attorney Erickson discussed aspects of Kyle's case with one of his partners who specialized in bankruptcy with the conversation focusing on how to best protect any settlement proceeds from creditors. Bankruptcy exemptions were discussed.

A retainer was prepared by Attorney Erickson for the employment of the firm in connection not only with Kyle's personal injury settlement but also in connection with any potential bankruptcy. The retainer was discussed with and signed by the co-guardians on June 22, 1989. Kyle was also at this particular meeting. At this meeting Erickson discussed with them what Kyle's long term problems might be, his assets, his recovery prospects and the risks and benefits associated with a bankruptcy filing. Attorney Erickson was aware at this time of Kyle's ongoing therapy and his continued need of it. He knew that if they were successful in protecting the settlement proceeds there would be no money with which to pay the medical bills. Erickson testified that bankruptcy and the possibility of exemptions had been discussed in a general way with Kyle several weeks prior to this June 22nd meeting. Kyle vaguely recalls discussing bankruptcy but Attorney Erickson testified he did not feel Kyle really understood the conversations.

In the meantime, Ehley and his supervisors continued to evaluate the claim from a company standpoint and were concerned, based upon the size of the medical bills and the possibility of a permanent leg injury, that it was a policy limits case that should be settled. On July 19, 1989, Attorney Erickson called Ehley advising him that it was indeed a policy limits case and that Kyle would settle for the $100,000.00 policy limits but wanted a structured settlement. The merits of a structured settlement were discussed with Kyle but National Farmers Union was not willing to provide an annuity themselves, preferring instead to pay Kyle the $100,000.00 directly in exchange for a full release of their insured. Kyle said he had no input regarding the annuity, when it was to commence or how the money was to be utilized. Attorney Erickson relayed Ehley's offer and concerns to the co-guardians telling them on July 25, 1989, that in view of National Farmers Union's reluctance to structure a settlement that they should do it themselves because Kyle, upon termination of the guardianship, would not be capable of handling that kind of money and would just fritter it away. There was also concern expressed about future medical expenses, and Kyle's probable support obligation arising in consequence of his having fathered an out of wedlock child. The firm had continued its research into various aspects of bankruptcy law and Attorney Erickson again at this time advised the co-guardians that there was a possibility of protecting the proceeds. They talked about a lump sum payment to Kyle but Erickson advised that it was out of the question and that the county court in any event would never approve it. He was of the opinion and so told the guardians that even annual payments would be a problem for Kyle to handle. On this same day he requested of St. Luke's that it send him the medical records and bills but made no mention to them of any settlement nor did he offer to pay the bills.

On August 1st Attorney Erickson telephoned the adjuster advising him that Kyle would settle for $100,000.00 in exchange for a release of all parties. The next day he followed up with a letter to Ehley containing a breakdown of Kyle's medical bills.

The insurance company assumed during this time that Attorney Erickson would work out the matter of the unpaid medical bills after the policy limits had been paid but was aware from comments made during the annuity discussions that bankruptcy was being considered. Indeed, in an intercompany letter dated August 7, 1989,

the home office claims department indicated a concern over Attorney Erickson's indication that he would have Kyle file bankruptcy rather than resolve the outstanding medical bills. Ehley testified that he thought Erickson's references to bankruptcy were just a negotiation ploy to get the bills settled.

In a letter of August 9, 1989, Ehley expressed concern over N.D.Cent.Code §§ 9–08–08 and 9–08–09 which provide for the avoiding of settlements made within six months of the injury.

Settlement was reached pursuant to the August 9th letter and Attorney Erickson drafted a petition for county court approval. The petition references Kyle's willingness to settle for $100,000.00 with disposition to be made as follows: Attorneys present and future fees and costs $5,656.00; cash to Kyle $4,344.00; $90,-000.00 to be invested in the purchase of an annuity. The petition provides that $900.00 of the attorney's fees is to cover future fees and costs incurred in bankruptcy. The petition was discussed with Kyle and the guardians with Erickson again reiterating the benefits to them of an annuity. The petition was filed with the county court and a hearing was held on August 25, 1989. The hospital was never made aware of these settlement negotiations and did not participate in them.

At the hearing the guardians as well as Kyle testified as to their understanding of the settlement. All were queried on the $90,000.00 annuity with Kyle being specifically asked if he and his attorney had discussed preparing a bankruptcy petition to take care of the medical bills and ensure that he actually receive the money. Kyle indicated he understood. Kyle also agreed that he was still taking outpatient therapy. The court authorized settlement and Attorney Erickson prepared a release and settlement agreement which was signed by the co-guardians and by Kyle as an incapacitated person on August 25, 1989.[1] As re-

quested by Farmers Union, the agreement contained a hold harmless provision by which co-guardians personally and in their representative capacity agreed to hold Kathryn Ahlberg as well as David Ahlberg and all other persons potentially liable from any and all causes of action arising out of the accident.

St. Luke's was not advised by anyone and did not appear at the settlement hearing. Attorney Erickson testified at the hearing on the present objections that he knew as long as there were outstanding bills that the hold harmless would be ineffective. According to Ehley, the company would not have settled for policy limits had it known the bills were not to be paid. He also testified that he knew Kyle's signature as an incapacitated person would not have any weight without the additional signatures of the guardians.

In any event, the money was received by Kyle and on August 29, 1990, Erickson made application for the annuity.

On October 25, 1989, the guardianship was terminated.

Although there had been communications between the hospital, the claims adjuster and Attorney Erickson, the hospital was never told that the bills would not be paid until August 30, 1989, when the credit department called Attorney Erickson and was told by him that Kyle was going to file bankruptcy. The hospital verified the fact of settlement and then took steps to file a hospital lien.

Erickson agrees he never seriously pursued settlement with the hospital and made no formal offers. Nor did he ever check into purchasing an annuity of lesser sum.

The hospital caused a notice of intent to claim hospital lien to be served upon Kyle on September 26, 1989. On October 5, 1989, the hospital sent Kyle's attorneys a letter advising them of the North Dakota hospital lien statute and that the hospital intended to claim a lien. Copies of the notice of intent to file a lien statement

---

**1.** Although still under a legal guardianship, Kyle's attending physician in an August 15, 1989 letter indicated that although still manifesting mild memory dysfunction, Kyle's orientation and cognitive skills had improved now such that he could be declared responsible to act in his own behalf.

together with a verified lien statement were enclosed with the letter. In the letter Kyle's attorneys are asked to provide the names of the tort-feasor and insurance carrier so that they might be notified of the hospital's lien claim.

On October 27, 1989, Kathryn Ahlberg and National Farmers Union were both served with the hospital lien statement.

The Chapter 7 bankruptcy petition was prepared in the middle of October and was filed on November 1, 1989. Kyle acknowledged that he signed the petition.

Attorney Erickson testified that his advice regarding the purchase of an annuity would have been the same irrespective of medical bills due to Kyle's inability to manage that sum of money, coupled with the future child support obligation. Leroy Smith as well as Kyle testified that they relied on Attorney Erickson's advice on all matters. Erickson agrees.

### Conclusions of Law

#### 1.

Before engaging in a discussion of the section 523 exemptions to discharge or the grounds for denial of a discharge under section 727(a) it is necessary to first of all carefully define precisely what a discharge is and what it is not.

■ Section 727(b) states that except as provided in section 523, a discharge discharges a debtor from all pre-petition debts. More precisely, section 524(a) provides;

"A discharge under this title—

(1) voids any *judgment* at any time obtained, to the extent that such judgment is a determination of the *personal liability* of the debtor with respect to any debt discharged under section 727 ..." (Emphasis added).

A discharge under section 727 operates to release a debtor's in personam obligations to a creditor but does not affect a creditor's in rem rights against security. Nor does a discharge in any way prevent enforcement of valid liens. *Long v. Bullard,* 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886); *Chandlers Bank of Lyons v. Ray,* 804 F.2d

577, 579 (10th Cir.1986); *In re Bouchelle,* 98 B.R. 81 (Bankr.M.D.Fla.1989); *In re Hughes,* 95 B.R. 20 (Bankr.E.D.N.Y.1989). All that is discharged by section 727 is a creditor's in personam rights against the debtor personally—that is, the right to sue the debtor for the unpaid debt. Any balance ceases to exist as a personal liability of the debtor subsequent to discharge but it does exist as a measure of the extent to which a creditor's lien may be enforced against property to which it attached.

■ Although judgments and judgment liens may be avoided by the discharge and may also be voided under section 522(f) as an impairment of exemption, valid statutory liens are neither effected by discharge or exemption declarations. Section 522(c)(2)(A) specifically excepts statutory liens from discharge and exemption:

(c) Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case, except— ...

(2) a debt secured by a lien that is—

(A)(i) not avoided under subsection (f) or (g) of this section or under section 544, 545, 547, 548, 549 or 724(a) of this title; and

(ii) not avoided under section 506(d) of this title; ...

The discharge of a debt itself may be prevented by proving up one of the section 523 exceptions and a debtor may be denied a discharge altogether by proving up one of the section 727(a) provisions. If successfully maintained, the result is that the debtor's in personam liability remains completely unaffected by bankruptcy and a creditor may seek not only the in rem enforcement of its lien or security interest, but may pursue the debtor personally as well, irrespective of whether or not the debt is secured or unsecured.

#### 2.

■ The requisite elements of proof attendant to the section 523 exceptions to discharge and the general discharge denial

provisions of section 727(a) all must be proven by clear and convincing evidence. Sections 523(a)(2)(A), (a)(4), (a)(6), and sections 727(a)(2)(A) and (a)(4)(C) all carry with them the element of intent on the part of the debtor. Section 523(a)(6) which excepts from discharge debts arising in consequence of willful and malicious injury additionally requires a heightened level of culpability on the part of the debtor. Under that section the conduct must be both willful and malicious—conduct which has been characterized as being headstrong and knowingly targeted at a creditor. *In re Long,* 774 F.2d 875 (8th Cir.1985). Critical to each of the foregoing sections, whether it be section 523 or section 727(a), is that the fraud or deceptive conduct be committed *by the debtor* and that the requisite degree of intent inherent in each of the sections be the debtors and not someone else's. This leads to the problem of imputed liability.

■ Generally, where malice or intent is *not* a necessary element of proof, an incapacitated person may be held responsible through a theory of imputed liability. However, the theory is rejected where malice or intent are elements of proof. Those few cases addressing imputed liability in the context of section 523 have completely rejected it, holding that the intent to be proved must be that of the debtor. *In re Eggers,* 51 B.R 452 (Bankr.E.D.Tenn.1985); *In re Austin,* 36 B.R. 306 (Bankr.M.D. Tenn.1984); *In re Cornell,* 42 B.R. 860 (Bankr.E.D.Wash.1984).

■ The facts of this case give rise to the possibility of a discharge exception under several of the foregoing sections[2] but the acts complained of were done at a time when Kyle himself was adjudicated to be an incapacitated person and at a time when both his person and property were under both a guardianship and conservatorship.

Under North Dakota law an "incapacitated person" is defined as "any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, chronic use of drugs, or other cause (except minority) to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person." N.D.Cent.Code § 30.1–26–01(1). Kyle was adjudicated an incapacitated person on June 8, 1989, and remained under the guardianship until October 25, 1989. It was during this time period that Attorney Erickson along with the guardians explored ways to preserve the settlement and avoid having it consumed by hospital and other medically related bills. Doubtless they discussed the impact a hospital lien might have on various settlement strategies. Although the facts do establish that Kyle met with Attorney Erickson in June and did discuss the annuity as well as nuances of bankruptcy with him, the facts do not satisfy this court that Kyle understood what was going on to form the requisite degree of intent necessary to either a section 523 or 727 cause of action. Although there is some evidence in the form of a letter suggesting that by August 15th, Kyle was no longer incapacitated, no expert testimony was offered on this point and the record is wholly inconclusive as to the degree of Kyle's mental faculties at various times throughout the period in question. The court places considerable weight on the fact of the guardianship being in place and is unwilling to conclude, given the state of the record, that Kyle was not an incapacitated person at all times relevant or that the guardianship notwithstanding, he was able to form the requisite degree of intent inherent in the referenced sections. This court is chary of imputing the intent of the guardians, Leroy and Roberta, to Kyle, given the burden of proof necessary and the great reluctance on the part of courts to deny a debtor a discharge except in those instances of egregious conduct proven by clear and convincing evidence. *E.g., Matter of Hartley,* 869 F.2d 394, 395 (8th Cir.1989); *In re Erdman,* 96 B.R. 978 (Bankr.D.N.D.1988).

---

2. A debtor's conversion of encumbered property to his own use and benefit may be regarded as an "injury" within the meaning of section 523(a)(6) and an action which impairs or defeats valid lien rights may constitute conversion. *In re Egan,* 52 B.R. 501 (Bankr.D.Minn.1985); *In re Pommerer,* 10 B.R. 935 (Bankr.D.Minn. 1981).

For the foregoing reasons the court will not find the debt to be nondischargeable nor will it find that the Debtor, Kyle Smith, is not entitled to a general discharge under section 727. The hospital may not, as a consequence, pursue its claim against him in personam.

### 3.

Having reached this conclusion as regards the in personam liability of the Debtor, Kyle Smith, still leaves the hospital with its in rem lien claim against the insurance proceeds and annuity payments.

 The hospital lien rights here claimed arise under North Dakota law and it is state law which defines the creation and validity of the lien as claimed. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The relevant statute in effect in 1989 provided as follows:

"Any charitable association, corporation, or other institution maintaining a hospital in this state *is entitled* to a lien for the reasonable value of hospitalization services rendered to a person injured in any accident. The lien attaches to all claims for relief, claims, demands, and judgments of record on account of the injuries against persons or corporations liable to the injured person in tort for damages occasioned by negligence causing the injuries, and attaches to the proceeds of the settlement of such claims or demands, and to insurance of the tortfeasor payable by reason of the liability occasioned by such injury, and to any insurance or indemnity payable to the injured person by any insurer."

N.D.Cent.Code § 35–18–01 (emphasis added).[3]

The seminal case in this state dealing with hospital liens is *Rolla Community Hosp. v. Dunseith Com. N. Home,* 354 N.W.2d 643 (N.D.1984). In that case the Supreme Court construed North Dakota Century Code § 35–18–01, holding that the term "shall be entitled" to a lien creates more than a mere permissive lien and results in the immediate attachment of a lien as soon as the hospital first renders services. *See*

*also Palm Springs General Hospital v. State Farm Mutual Ins. Co.,* 218 So.2d 793 (Fla.Dist.Ct.App.1969). *See also In re Nelson,* 92 B.R. 837 (Bankr.D.Minn.1988), holding that under a similar Minnesota hospital lien statute, the lien was created and attached to a patient's pre-existing cause of action when hospital services were first rendered. The Debtor here argues that the distinction between the pre–1985 statutory language and the language of the present statute is significant in that deletion of the term "shall be" and insertion of the term "is entitled" suggests that there can be no lien unless the requirements of sections 35–18–02 and 35–18–03 are first complied with. The Debtor argues that the use of the term, "is entitled to" clearly demonstrates permissive as opposed to a mandatory lien. With this review the court disagrees. The legislative history concerning the 1985 amendment to N.D.Cent.Code § 35–18–01 indicates that substitution of the word "is" for the term "shall be" was intended as nothing more than a technical correction. S.B. 2086, 1985 Sess., ch. 82, § 90. North Dakota Century Code § 35–18–03 requiring the filing of a lien statement not later than thirty days after rendering services, as well as North Dakota Century Code § 35–18–02 requiring the service of a notice of intent to file, are not, in the case of hospital liens, statutory prerequisites for attachment but both are merely constructive notice provisions which must be met to accomplish perfection only if a party entitled to notice does not have actual notice of the lien. In *Rolla, supra,* the court said that the only purpose of recording a lien is to give notice and if actual notice (defined as "express information of a fact") exists then the need for filing or recording is not necessary. Hospitals "furnishing care and treatment acquire a lien upon rendering such service". *Rolla,* 354 N.W.2d at 650. It is the mere furnishing of services that creates the lien and it is either by actual or constructive notice that the lien is perfected. Thus, the hospital's lien attached as of April 24, 1989,

---

**3.** N.D.Cent.Code § 35–18–01 was amended in 1985 to include the term "is entitled". Previous-
ly, the statute made use of the term "shall be entitled".

to all claims for relief arising in consequence of Kyle's accident and also attached to all settlement proceeds. The lien was on that date created.

In the case at bar, although no party received constructive notice by service of a section 35–18–02 notice of intent until the Fall of 1989, the court is satisfied that all parties, the Ahlbergs, National Farmers Union, Leroy and Roberta, as well as Kyle himself, had actual notice of the hospital's lien long before the receipt of the settlement proceeds and their conversion into an annuity.

The hospital's statutory lien is not defeated by Kyle's exemption of the settlement proceeds unless the lien is somehow avoidable under one of the avoidance provisions set forth in section 522(c)(2)(A).[4] It is not avoidable under section 522(f) because it is neither a judicial lien nor a nonpossessory nonpurchase money security interest. Section 506(d) is inapplicable for the reason that the hospital's lien is secured by value. It is not subject to avoidance under section 545 because it first became effective against the Debtor on April 24, 1989, long before the bankruptcy petition was filed and was, as of the date of the petition, perfected in a manner consistent with applicable North Dakota state law as defined by the North Dakota Supreme Court.

In sum, the court finds that at all times subsequent to April 24, 1989, the hospital lien of St. Luke's attached to all claims for relief and resulting settlement proceeds and was perfected and enforceable against the same by virtue of the fact that all parties, including Kyle, had actual notice of the lien. The lien, as a consequence, remains valid and enforceable against the Presidential Life Insurance Annuity as the annuity constitutes proceeds of a settle-

ment under section 35–18–01 of the North Dakota Century Code.

Accordingly, IT IS ORDERED that:

1. The hospital lien of the plaintiff, St. Luke's Hospitals of Fargo, in the sum of $48,057.00 remains valid and enforceable against the Presidential Life Insurance Annuity and St. Luke's Hospitals of Fargo is free to pursue its in rem remedies available under state law.

2. That the Debtor, Kyle Smith, is entitled to a discharge in personam and St. Luke's remaining causes of action resting upon sections 523 and 727 are dismissed.

JUDGMENT MAY BE ENTERED ACCORDINGLY.

---

**4.** This decision addresses the hospital lien only in the context of Kyle Smith's status as a debtor under Chapter 7 of the U.S. Bankruptcy Code and the effect of the claim of exemption as well as the Code generally upon that lien. The decision does not address the issue as between St.

Luke's, National Farmers Union, Leroy Smith, Roberta Clark, or Kathryn Ahlberg. That matter is the subject of a separate lawsuit presently pending in North Dakota State District Court for Cass County.