**In re Randy ZINKE and Karen Zinke d/b/a Zinke Feedlot, Debtors.**

**FIRST NATIONAL BANK OF McCLUSKY, Plaintiff,**

**v.**

**Randy ZINKE d/b/a Zinke Feedlot, Defendant.**

**Bankruptcy No. 93–30509. Adv. No. 93–7072.**

United States Bankruptcy Court, D. North Dakota.

Aug. 15, 1994.

Rebecca Thiem, Bismarck, ND, for plaintiff.

Michael Ward, Minot, ND, for defendant.

## MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The plaintiff-creditor, First National Bank of McClusky (Bank), commenced the above-entitled adversary proceeding by Complaint filed on September 20, 1993, requesting that the defendant-debtor, Randy Zinke (Zinke), be denied a discharge generally pursuant to 11 U.S.C. § 727(a)(2) and (a)(4). In the alternative, the plaintiff seeks to have outstanding prepetition indebtedness declared nondischargeable under 11 U.S.C. § 523(a)(2)(B), (a)(4), and (a)(6). The defen-

dant-debtor, Randy Zinke (Zinke), generally denies the allegations set forth in the Complaint.

Trial was held on July 19, 1994. From the evidence presented and arguments made, the court finds the facts set forth herein material to the resolution of the case and makes the following conclusions of law:

## FINDINGS OF FACT

The debtors, Randy and Karen Zinke, were engaged in a small grains and livestock farming operation. In addition to raising and selling cattle, poultry, and hogs on their own account, a part of the debtors' operation apparently consisted of feeding cattle for others under various contracts. For reasons which are not altogether clear, the debtors filed for protection under Chapter 7 of the United States Bankruptcy Code on June 17, 1993.

Randy Zinke entered into a series of commercial loan transactions with the First National Bank of McClusky which provided Zinke with secured financing critical to the farming operation. Under the express terms of the various security agreements, Zinke gave the Bank as collateral for the loans a security interest in livestock, farm products, inventory, equipment, accounts, instruments, chattel paper and other rights to payment, crops and all proceeds of collateral. *See* Exhibits 1 & 2. The Bank was oversecured. The security agreements further provided that Zinke would not sell any property which served as security for the loans without first obtaining written permission from the Bank or designating the Bank as co-payee on any instrument.[1] Although Zinke testified that he did not understand certain aspects of the security agreements, he was fully aware that he gave the Bank a security interest in the aforementioned items of collateral and that the proceeds from any collateral sales were to be remitted directly to the Bank. Additionally, Zinke maintained a checking account at the Bank and gave the Bank a right to set-off any funds received against outstanding indebtedness.

Zinke provided the Bank with detailed financial statements on an annual basis which he executed in connection with the various financing transactions. *See* Exhibit 4. The financial statements, dated October 25, 1990, February 9, 1991, February 27, 1992, and February 2, 1993, were indeed part and parcel of the application process and thus were critical to loan approval and collateral assessment.[2] Each of the financial statements represented that Zinke actually owned at least 13 breeding cows and projected a corresponding number of calves to be made available as additional security for the loans. However, the debtors' schedules which were executed on June 14, 1993, reveal that they actually owned only "2 Old Cows" and 6 heifers. Zinke was unable to satisfactorily explain the discrepancy between the number of cattle represented in financial statements which served as collateral for the loans, with the number of cattle depicted in the bankruptcy schedules. Although Zinke offered a number of possible explanations, he was unable to account for the missing cattle. Zinke's sworn testimony at his 2004 examination, however, sheds some light on the issue:

Q: But are there any cattle or any cows that were listed on a financial statement with the First National Bank of McClusky that have been sold to your dad?

A: Yeah.

Q: Okay. And that's the cows I was actually asking about here ..., the cows that were listed on the financial statement of the bank—and you probably remember

---

1. The security agreements which Zinke executed provided in part as follows:
   I will not try to sell the property unless it is inventory or I receive your written permission to do so. If I sell the property I will have the payment made payable to the order of [the Bank and Zinke].
   Exhibit 2.
   I will not sell or transfer any rights in the property without your written permission....

Exhibit 1.

2. An officer of the Bank testified that he considered the financial statements to be a material part of the loan transactions and, accordingly, actually relied on them and the specific items of collateral depicted therein in extending Zinke credit.

what they are—when were those sold to your dad? There's 13 cows here.

A: Late Eighties.

Q: So the 13 cows that we have listed on your financial statement that you signed on February 2, 1993, what you're telling me is that those had already been given or sold to your dad in the late Eighties?

A: Yep.

Deposition Testimony of Randy H. Zinke, at 45–46.

The Bank attempted to keep track of the number of head of cattle that Zinke actually had by maintaining its own records of cattle purchases and sales as well as periodically inspecting the Zinke farm. The Bank maintained a "large transaction report" which enabled it monitor all deposits made and checks drawn on the Zinke account that were in excess of $2,500.00. Additionally, it was the Bank's policy that *all* proceeds from cattle (or other collateral) sales made by Zinke be remitted to the Bank and applied to servicing the outstanding indebtedness; consequently, it was standard operating procedure to have the Bank listed as a co-payee on checks from cattle sales. It would be necessary to create a new loan should Zinke need funds to acquire replacement cattle or for operating expenditures.

Zinke departed from the agreement he had with the Bank and standard operating practice by selling cattle that served as security for the loans and converting the majority of the proceeds from the sales thereof to personal use.[3] Only a fraction of the sale proceeds were deposited in his account at the Bank and ultimately turned over to satisfy a portion of the outstanding indebtedness.[4] The proceeds from the cattle sales that were converted to personal use were conveniently deposited in his wife's account at the GEM Federal Credit Union in Minot, North Dakota.[5] The Bank was completely unaware of the subject cattle sales and never consented to allowing the debtor to retain the proceeds from any such sales. Since the proceeds from the cattle sales were not deposited at the Bank and the sales went undetected, the Bank was unable to monitor its collateral and was therefore ignorant of the fact that its security was at risk or that its collateral was dissipating.

On February 17, 1992, Zinke entered into a lease agreement which contained a purchase option with AAA Leasing for various items of farm equipment. *See* Exhibit 13. Zinke traded in equipment that was subject to the Bank's security interest in order to make the down payment on the lease. Although the debtors were not married until October of 1992, "Karen *Zinke*" signed the lease agreement as well as the financing statement and was designated as the sole obligor. "Randy" Zinke's name initially appeared on the lease agreement as well as the financing statement but, for some reason, was subsequently removed.

On or about November 17, 1992, Zinke sold a tractor that was subject to the Bank's security interest to a Canadian buyer. *See* Exhibit 14. Zinke did not disclose to the purchaser that the tractor was subject to a security interest in favor of the Bank. Moreover, Zinke retained the proceeds from the sale and applied a portion toward the purchase of a new tractor.[6] The new tractor was purchased on January 11, 1993, from Twin City Implement. *See* Exhibit 15. In order to effectuate the sale, Zinke traded in a

---

**3.** Zinke sold cattle that the Bank had a security interest in on at least four separate occasions: October 7, 1992—$998.20; October 21, 1992—$3,081.35; December 16, 1992—$5,342.63; December 16, 1992—$30,903.78; January 20, 1993—$33,737.79. *See* Exhibit 11 & 17, at 21.

**4.** Although the proceeds of the cattle sales aggregated $74,063.75, only $27,115.00 was deposited in his account at the Bank and applied toward debt service.

**5.** Since the checks which represented the sales of the subject cattle did not specify the Bank as a

co-payee, its endorsement on the instruments was not necessary. On at least one occasion, Karen Zinke was designated as the sole payee despite the fact that she never maintained an ownership interest in the cattle. *See* Exhibit 17, at 21. Curiously, a number of checks that Zinke deposited in his wife's account were made payable to Randy Ze nke.

**6.** The check representing the proceeds from the sale of the tractor was deposited in the account at GEM Federal Credit Union.

tractor that was subject to the Bank's security interest. However, Zinke specifically represented to Twin City Implement that the trade-in tractor was free from all encumbrances.[7] In June of 1993, an officer of the Bank visited the Zinke farm and saw the new tractor. Upon direct inquiry, Zinke told him that he was merely renting it and that the tractor previously traded in and subject to the Bank's security interest was in the shop getting needed repairs.

Zinke sold hogs and hay that were subject to the Bank's security interest and retained all of the proceeds therefrom for personal use. *See, e.g.,* Exhibit 16. The checks from the hog and hay sales were deposited in the account at GEM Federal Credit Union. None of the proceeds from the aforementioned sales were remitted to the Bank.

The debtors, in need of funds and realizing that the Bank would otherwise be designated as a co-payee on any checks, sold grain that was subject to the Bank's security interest under their son's name. Since their son was only three months old at the time, Zinke forged his signature on the back of the checks which represented the proceeds from the grain sales. *See* Exhibit 12. All of the grain sales occurred on or just days before the filing of the bankruptcy petition, with all of the proceeds therefrom being converted entirely to personal use. Zinke in fact sold the very grain that he represented on the schedules was on hand.[8] *See* Exhibit 18, at 6.

In addition to alleging that Zinke's conduct was calculated to hinder or defraud, the Bank points to certain inaccuracies in the debtors' schedules as the focal impetus for its objection under § 727. Specifically, the Bank avers that the debtors' omission of an interest in a 1993 CRP payment constituted a false oath or account which warrants the denial of a discharge. Zinke explained that due to the fact that he harvested hay on the land that should have been set aside, he *may not* be entitled to receive any CRP payment

for the 1993 year. Consequently, the contingent interest was not scheduled.

After the bankruptcy filing, the Bank obtained relief from the automatic stay and sold the collateral which remained after Zinke's dispositions at a public auction. A net loan balance of $61,836.23 remained outstanding after applying the proceeds and expenses of the sale to the indebtedness. *See* Exhibit 26.

## CONCLUSIONS OF LAW

### 1.

■ Section 523 of the United States Bankruptcy Code enumerates specific exceptions to the general rule of dischargeability of debts in bankruptcy, while § 727 sets forth the basis for a wholesale denial of a discharge. The requisite elements of proof attendant to the § 523(a) exceptions to discharge and the general denial of discharge provisions of § 727(a) all must be established by a preponderance of the evidence, with the burden of proof falling squarely on the shoulders of the objecting creditor. *Grogan v. Garner,* 498 U.S. 279, 283–91, 111 S.Ct. 654, 657–61, 112 L.Ed.2d 755 (1991). *See Beaubouef v. Beaubouef (In re Beaubouef),* 966 F.2d 174, 178 (5th Cir.1992); *First Nat'l Bank v. Serafini (In re Serafini),* 938 F.2d 1156, 1156–57 (10th Cir.1991); *Superior Nat'l Bank v. Schroff (In re Schroff),* 156 B.R. 250, 254 (Bankr.W.D.Mo.1993); *Bartlett Futures, Inc. v. Davis (In re Davis),* 124 B.R. 831, 835 (Bankr.D.Kan.1991) (applying the ordinary preponderance of the evidence standard articulated in *Grogan, supra,* in the context of nondischargeability actions under § 523(a), to objection to discharge proceedings under § 727(a)).

■ 11 U.S.C. § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another...." 11 U.S.C. § 523(a)(6). In terms of nondischargeability under the aforementioned provision, courts have noted that the concept of "injury" is relatively broad. *Dahlgren & Co. v. Lacina*

---

**7.** Zinke's signature appeared directly below the following: "I guarantee all trade-ins listed above to be free and clear of *all* liens and encumbrances...." *Exhibit* 15.

**8.** Zinke explained that he executed his schedules on June 14, 1993, and sold the grain on June 17, 1993, which happened to be the day of the bankruptcy filing.

*(In re Lacina)*, 162 B.R. 267, 272 (Bankr. D.N.D.1993). The United States Supreme Court has long ago noted that the term "injury" is not restricted to merely physical harm but embraces economic injury as well:

> "To deprive another of his property forever by deliberately disposing of it without semblance of authority is certainly an injury thereto within the common acceptation of the words."

*Id.* (quoting *McIntyre v. Kavanaugh*, 242 U.S. 138, 141, 37 S.Ct. 38, 40, 61 L.Ed. 205 (1916)). Courts have uniformly held that a "conversion of another's property without his knowledge or consent, done intentionally and without justification or excuse, to the other's injury, is a willful and malicious injury within the meaning of" § 523(a)(6). 3 *Collier on Bankruptcy* ¶ 523.16, at 523–130 (15th ed.1994). It is therefore well settled that "[a] debtor's conversion of encumbered property to his own use and benefit may be regarded as an 'injury' within the meaning of section 523(a)(6) and an action which impairs or defeats valid lien rights may constitute conversion." *St. Luke's Hosps. of Fargo, Inc. v. Smith (In re Smith)*, 119 B.R. 714, 721 n. 2 (Bankr.D.N.D.1990); *see Mercury Marine Acceptance Corp. v. Wheeler (In re Wheeler)*, 96 B.R. 201, 203 (W.D.Mo.1988) (ruling that a "[c]onversion occurs when an individual sells property in which another party has a security interest."); *Production Credit Ass'n v. Clark (In re Clark)*, 50 B.R. 122, 125 (Bankr.D.N.D.1985). Accordingly, the wrongful disposition of collateral can be injurious conduct giving rise to a nondischargeable obligation under the statute. *American Family Fin. Servs., Inc. v. Johnson (In re Johnson)*, 166 B.R. 365, 366 (Bankr.E.D.Mo.1994). *See, e.g., Oetker v. Bullington (In re Bullington)*, 167 B.R. 157, 161–62 (Bankr.W.D.Mo.1994).

■ A merely technical conversion or simple interference with a creditor's legal rights, however, is not, in and of itself, enough to prevent the discharge of a particular debt. *See Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524, 1526–27 (10th Cir.1993) (noting that not every intentional act or breach of an agreement necessarily falls within the ambit of

§ 523(a)(6)); *Kellerhuis v. Egan (In re Egan)*, 52 B.R. 501, 507 (Bankr.D.Minn.1985) (noting that a debtor's sale or disposition of collateral, however tortious, is not an act which invariably gives rise to a determination of nondischargeability under § 523(a)(6) in all cases). *Cf. Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). In order for a conversion to be more than an innocent or technical conversion, it must have been willful and malicious. The terms "willful" and "malicious" which reference the state of mind of a wrongdoer in creating a nondischargeable debt, are terms of art that each constitute a separate element. *Dahlgren & Co. v. Lacina (In re Lacina)*, 162 B.R. 267, 274 (Bankr. D.N.D.1993); *Bosch v. Bumann (In re Bumann)*, 147 B.R. 44, 47 (Bankr.D.N.D.1992). The presence of one element without the other will not support a claim for nondischargeability under § 523(a)(6). *United States v. Vandrovec (In re Vandrovec)*, 61 B.R. 191, 196 (Bankr.D.N.D.1986).

■ The element of "willfulness" is almost universally defined as conduct that is deliberate or intentional. *Johnson v. Miera (In re Miera)*, 926 F.2d 741, 744 (8th Cir.1991). In clarifying this element in the context of collateral dispositions in breach of security agreements, the Eighth Circuit Court of Appeals has held that the term embodies an awareness which is "headstrong and knowing". *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir.1985). Conduct that is merely negligent or reckless is insufficient. *In re Miera*, 926 F.2d at 744.

■ The "maliciousness" element of § 523(a)(6) requires a heightened level of culpability which transcends mere willfulness. In the Eighth Circuit, a debtor's conduct is malicious if it is "targeted at the creditor ... at least in the sense that the conduct is certain or almost certain to cause financial harm." *In re Long*, 774 F.2d at 881. "A malicious conversion envisions a tort with aggravating features which warrants a deduction that the act transcends a minimal or technical wrongdoing and evinces a willingness to voluntarily inflict injury." *Thorp Credit & Thrift Co. v. Pommerer (In re*

*Pommerer),* 10 B.R. 935, 940 (Bankr.D.Minn. 1981). The malice standard *does not,* however, require spite, ill will, or a personal animosity. *Dahlgren & Co. v. Lacina (In re Lacina),* 162 B.R. 267, 275 (Bankr.D.N.D. 1993). A wrongful act is malicious if it is "done intentionally, without just cause or excuse, and with the intent to injure" or there exists a "knowing wrongfulness or knowing disregard of the rights of another." *Id.* (quoting *Skaarer v. Fercho (In re Fercho),* 39 B.R. 764, 767 (Bankr.D.N.D.1984)). The malice element therefore tests whether the debtor's actions were in fact, or should have reasonably been recognized to be, certain to cause financial harm to the plaintiff when undertaken.[9] *Id.* In this vein, a debtor is charged with the natural consequences of his actions; therefore, an act may readily be found to be "malicious" even in the absence of a specific, subjective intent to injure. *Id.* Malice may thus be inferred from the nature of the wrongful act. *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton),* 942 F.2d 551, 554 (9th Cir.1991).

■ In the case at bar, this court has absolutely no trouble in concluding that Zinke's repeated and unauthorized dispositions of collateral in contravention of the express dictates of the security agreements, resulted in an "injury by the debtor ... to the property of another entity" and were *both* "willful" and "malicious" within the meaning of § 523(a)(6). It is undisputed that the Bank acquired rights in the specific items of property that Zinke disposed of by virtue of the security agreements Zinke executed. The sale of pledged collateral and retention of the proceeds therefrom for personal use without obtaining the secured creditor's consent is a conversion. Although Zinke attempted to establish that the Bank somehow knew about some of the dispositions or consented to them, the court finds his testimony

on this point to be not at all credible and contrary to the greater weight of the evidence which unequivocally established that the dispositions were unauthorized.

The evidence was abundantly clear that Zinke knowingly and intentionally acted in contravention of the Bank's interests. Zinke fully understood that by diverting the proceeds from the sale of secured collateral to pay living and operating expenses while the Bank remained unpaid, he was violating the terms of the security agreements. The surreptitious manner by which he disposed of the Bank's collateral (i.e., putting grain sales in the name of his three-month old son and forging his signature on checks to obtain the proceeds on the eve of bankruptcy; failing to disclose, or intentionally misrepresenting, that the various pieces of equipment he sold and traded-in was encumbered by a lien in favor of the Bank; and refraining from depositing funds from collateral sales in the Bank, etc.) was unquestionably calculated to escape the attention of the Bank as well as to gain unfettered access to secured funds.

■ The manner in which Zinke effectuated the dispositions of secured collateral effectively negates any contention of an honest intent or that he was somehow oblivious to the various encumbrances. Moreover, a personal need for cash is *never* an acceptable basis under the law for a conscious breach of a security agreement, nor a legitimate excuse to the calculated disposition of pledged collateral in derogation of the interests of a secured creditor. The totality of the evidence in this case amply demonstrated that Zinke acted with a knowing and callous disregard of the rights of the Bank. The prospect of financial injury to the Bank's interests were in fact, or reasonably should have been recognized to be, certain to follow from Zinke's actions when undertaken.

---

**9.** With respect to the issue of the likelihood of causing financial harm, it has been held that:

Loss to the creditor of the interest in the property converted, is, ordinarily, sufficient financial harm to make a willful conversion malicious. Ultimate failure to pay the secured debt is simply the ripening of the harm into a viable cause of action for fixed damages. The misconduct that results in nondischargeability is the incident of *knowingly, intentionally and*

*wrongfully destroying the interest converted,* not the later failure to pay the underlying debt from some other source.

*Universal Pontiac–Buick–GMC Truck, Inc. v. Routson (In re Routson),* 160 B.R. 595, 607 (Bankr.D.Minn.1993) (emphasis in original). *Accord Johnson v. American Family Fin. Servs., Inc. (In re Johnson),* 166 B.R. 365, 367 (Bankr. D.Minn.1994).

2.

■ The Eighth Circuit Court of Appeals has opined that debtors who willfully and maliciously violate security agreements are testing the outer limits of their right to a fresh start in bankruptcy. *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 882 (8th Cir.1985). However, the general denial of a discharge under § 727(a) is a drastic remedy that is not to be taken lightly by a court. It is therefore incumbent upon an objecting creditor to marshall clear and cogent evidence of a debtor's violative conduct under the specific dictates of § 727(a) in order to prevail. Although the debtors' schedules are not the model of accuracy and exactitude (and the schedules should indeed be amended to accurately reflect the debtors' contingent interest in the 1993 CRP payment), the facts as presented in this case, especially when tempered with the Code's policy of liberal construction in favor of debtors, militate, however slightly, against the objecting creditor.

Accordingly, and for reasons stated, **IT IS ORDERED** that the plaintiff's objection to discharge under section 727(a) is in all things **DENIED. IT IS FURTHER ORDERED** that judgment be entered in favor of the plaintiff-creditor, First National Bank of McClusky, and against the defendant-debtor, Randy Zinke d/b/a Zinke Feedlot, in the amount of $61,836.23, said sum being nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(6).[10]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

10. The court has given Zinke the benefit of the doubt and assumed, *arguendo*, that the cattle set forth in the financial statements were indeed in existence at the time the financial statements were executed, although this fact was called into question. Had they not been in existence, this court would have little trouble in concluding that a basis for nondischargeability under § 523(a)(2)(B) was established with the requisite degree of proof with respect to those items of collateral.