**In re James E. LACINA, Debtor.**

**DAHLGREN & COMPANY, INC., Plaintiff,**

v.

**James E. LACINA, Defendant.**

Bankruptcy No. 92–31168.
Adv. No. 93–7020.

United States Bankruptcy Court,
D. North Dakota.

Oct. 14, 1993.

Joseph Turman, Fargo, ND, for plaintiff.

Earl W. Anderson, Jr., Rutland, ND, for defendant.

## MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The plaintiff-creditor, Dahlgren & Company, Inc. (Dahlgren), commenced the above-entitled adversary proceeding by complaint filed March 22, 1993, arguing its claim arose from a "willful and malicious injury by the debtor" to its property and was therefore barred from discharge pursuant to 11 U.S.C. § 523(a)(6). The defendant-debtor, James E. Lacina (Lacina), essentially avers that his conduct was not "malicious" within the meaning of the applicable statutory provision and, accordingly, any obligation stemming from his prepetition conduct should be amenable to discharge.

Trial was held on August 16, 1993, with the defendant appearing pro se. From the evidence presented and arguments made, the

court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

This case arose out of circumstances surrounding an employer-independent contractor relationship whereby Dahlgren & Company, Inc. employed James E. Lacina to serve as a dealer for Dahlgren products. The parties entered into a dealer agreement on March 9, 1984 whereupon Lacina, as a dealer for Dahlgren, sold certified seed to various farm customers. In addition to his dealer arrangement with Dahlgren, Lacina owned and operated a custom combining business.

Under the standard dealership agreement, it was customary for dealers such as Lacina to order large quantities of seed early in the season by placing blanket orders for seed with Dahlgren in order to cover anticipated demand. The seed was subsequently delivered to the dealers under what essentially amounted to a consignment arrangement. Upon delivery of the seed to the dealer, an account maintained by Dahlgren in the dealer's name which represented the delivered quantity was debited. The dealer was responsible for storing the seed and assumed the risk of loss for any seed that was damaged after delivery to the dealer's location. At the end of the season, any unsold seed that was not damaged could be returned to Dahlgren for credit. It was the dealer's responsibility to deliver the seed to its customers. Further, the dealer was required to collect payments for the seed sold on customer accounts and remit the proceeds therefrom with an accompanying remittance form directly to Dahlgren.[1] In fact, the dealer sales manual clearly provided the manner in which the proceeds of all dealer sales were to be remitted. It provided: "We request that you have your customers make checks payable to **Dahlgren and Company, Inc.**"

(Plaintiff's Exhibit 25). Lacina was well aware of this policy and conducted his operation in accordance with it.

Customer payments were due in full by June 1st of each year and the final settlement of dealer accounts with the company was July 1st of each year, or 10 days after any unsold seed was returned to the company.[2] Thereafter, dealers with credit balances received commissions from Dahlgren for the sales of the seed while those dealers with debit balances were required bring their accounts up to date.

Lacina had successfully operated in accordance with the dealer agreement for a number of years and on one occasion had been presented by Dahlgren with a "Dealer of the Year" award for his performance. Subsequently, Lacina's financial situation began to markedly deteriorate. His custom combining business eventually became a substantial drain on his personal finances. In an effort to meet operating expenses associated with his custom combining business as well as satisfy personal obligations, Lacina deviated from required company policy and the manner in which he operated under the dealership agreement with Dahlgren over the years and began converting the proceeds from payments made by his Dahlgren customers to personal use.

Over a period of time from 1988 through 1991, Lacina embarked upon a course of conduct which goes to the heart of the instant proceeding. During this period, a large number of the checks that Lacina received from his customers as payment for the seed sales were converted to cash almost immediately after receipt. Although all of the checks were made payable to Dahlgren in accordance with company policy, Lacina repeatedly forged the Dahlgren endorsement in order to acquire the funds therefrom for

1. The remittance form was essentially a "delivery receipt" which specified, among other things, the customer's name, address, and signature, as well as the cost, lot number, type, and amount of seed ordered by and delivered to a particular customer. It was the receipt of this remittance form which enabled Dahlgren to monitor seed sales.

2. Lacina testified that he placed bulk orders for the seed in September with the anticipation that he would be able sell the quantity he stored to his customers. In February, Dahlgren would deliver the bulk order of seed to Lacina who would store it in a facility owned by him until sales of the seed were effectuated in April or May.

his own use.[3] Three of the forged checks were simply cashed directly by Lacina on separate occasions at the State Bank of Marion in Marion, North Dakota.[4] On at least nineteen other occasions, Lacina converted the customer checks made payable to Dahlgren into money orders or cashier's checks at a branch bank located in Dickey, North Dakota by forging the Dahlgren endorsement. The money orders or cashier's checks, which identified Dahlgren as the payee and Lacina as remitter, were thereafter converted to cash by Lacina at the main bank location approximately ten miles away in Marion, North Dakota.[5] The aggregate amount of customer checks that were converted to cash and utilized by Lacina entirely for his personal use totaled $44,121.45.

In an effort to conceal his actions, Lacina did not remit any of the remittance forms (delivery receipts) which documented the actual sales of the seed to Dahlgren on those occasions where he converted the customer payments to cash. Since Lacina was selling the Dahlgren seed from the bulk inventory warehoused on his property, Lacina's actions went undetected until the debit status of his account prompted an investigation.

The aforementioned facts are largely undisputed. Lacina readily admitted forging the Dahlgren endorsement on customer checks and testified that he fully intended to utilize the converted cash entirely for personal use at the time that he forged the checks—the money was used either to satisfy personal obligations or fund the operation of his custom combining business. He further admitted knowing that Dahlgren was not going to get paid from the sales of the seed at the time that he converted the checks to cash. By way of explanation, however, Lacina testified that although he did not have the funds to reimburse Dahlgren for the converted proceeds of the seed sales at the time of the conversions, he hoped to later repay the company from anticipated income from his custom combining business. Despite his professed hopes, the requisite income from his custom combining income never materialized and Lacina's financial burden became insurmountable. Consequently, Lacina filed for relief under Chapter 7 of the Bankruptcy Code.

## CONCLUSIONS OF LAW

Section 523 of the United States Bankruptcy Code enumerates specific exceptions to the general rule of the dischargeability of debts in bankruptcy. In determining whether a particular debt falls within the ambit of § 523, the statute should generally be construed liberally in favor of the debtor and strictly against the objecting creditor in order to effectuate the fresh start principles which pervade the entire bankruptcy system. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Werner v. Hofmann (In re Hofmann)*, 144 B.R. 459, 463 (Bankr.D.N.D.1992), *aff'd by* 5 F.3d 1170 (8th Cir.); 3 *Collier on Bankruptcy*, ¶ 523.-05A at 523–19 (15th ed. 1993). This liberal construction is, however, tempered by the view that such equitable considerations ' "are applicable only to honest debtors." ' *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987) (quoting *In re Hunter*, 771 F.2d 1126, 1130 (8th Cir.1985)); *see Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) (opining that the overarching purpose of bankruptcy law is to afford relief to the "honest but unfortunate debtor"). The scope of the fresh start principle which is at the heart of bankruptcy law is thus expressly limited under § 523 of the Code by restricting general discharge to honest debtors in order to prevent abuse.

The proper standard of proof applicable in nondischargeability actions which arise under § 523(a) was conclusively established by the United States Supreme Court as the ordinary preponderance of the evidence stan-

---

3. Despite Lacina's contentions to the contrary, the greater weight of the evidence revealed that Lacina was not in fact authorized or had any reason to believe that he was authorized to endorse customer checks on behalf of Dahlgren.

4. The three forged checks that were converted directly to cash totaled $2,031.30. (Plaintiff's Exhibits 20–22).

5. The money orders or cashier's checks that were ultimately converted to cash totalled $42,090.15. (Plaintiff's Exhibits 1–19).

dard. *Grogan v. Garner,* 498 U.S. 279, 283–91, 111 S.Ct. 654, 657–61, 112 L.Ed.2d 755 (1991). "Preponderance of the evidence" has been defined as meaning the greater weight of evidence.[6] *Smith v. United States,* 726 F.2d 428, 430 (8th Cir.1984). Further, it is incumbent upon a moving creditor to met the burden of proving each element of the exception to discharge which it is relying in accordance with the aforementioned standard.

The operative provision relied upon by the plaintiff, Dahlgren and Company, Inc., to establish a basis for nondischargeability is § 523(a)(6) which renders nondischargeable in a Chapter 7 case any debt:

> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . .

11 U.S.C. § 523(a)(6). Under § 523(a)(6), financial obligations arising from a defendant's "willful and malicious injury" to a creditor's property interest are nondischargeable. In the instant case, the unauthorized and surreptitious acts by Lacina of repeatedly forging the Dahlgren endorsement and converting the proceeds therefrom to his personal use resulted in an "injury by the debtor . . . to the property of another entity" and were *both* "willful" and "malicious" within the meaning of § 523(a)(6).

In terms of dischargeability under § 523(a)(6), it has been noted that "injury" is a broad concept. *Cheek v. Lowe's of Georgia, Inc. (In re Cheek ),* 17 B.R. 875, 878 (Bankr. M.D.Ga.1982). The United States Supreme Court in examining a statutory predecessor of § 523(a)(6) which contained substantially the same language stated:

> To deprive another of his property forever by deliberately disposing of it without semblance of authority is certainly an injury thereto within the common acceptation of the words.

*McIntyre v. Kavanaugh,* 242 U.S. 138, 141, 37 S.Ct. 38, 40, 61 L.Ed. 205 (1916). The underlying debt sought to be discharged in the instant matter was unquestionably the result of the debtor's acts of unlawfully forging the plaintiff's endorsement on a number of checks and appropriating the proceeds therefrom for personal use. As such, the plaintiff's loss or injury directly emanated from the forgeries of the checks. Furthermore, it should be noted that "[i]njuries within the meaning of the exception are not confined to physical damage or destruction; but an injury to intangible personal or property rights is sufficient." 3 *Collier on Bankruptcy,* ¶ 523.16 at 523–130 (15th ed. 1993).

Although a plain reading of § 523(a)(6) reveals that there is no specific reference to a debt arising from the unlawful conversion of property as being nondischargeable, courts have uniformly held that it was indeed the intent of Congress to include within § 523(a)(6) the willful and malicious conversion of property by a debtor. *Reiten Equip., Inc. v. Wightman (In re Wightman ),* 36 B.R. 246, 252 (Bankr.D.N.D.1984); 3 *Collier on Bankruptcy,* ¶ 523.16 at 523–136–40 (15th ed. 1993); *see* S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978); *available in* 1978 U.S.C.C.A.N. 5787, 5865 (indicating that "debts for willful and malicious *conversion or injury* by the debtor to another entity or the property of another entity are nondischargeable." (emphasis added)). Hence, "the conversion of another's property without his knowledge or consent, done intentionally and without justification or excuse, to the other's injury, is a willful and malicious injury within the meaning of the exception." 3 *Collier on Bankruptcy,* ¶ 523.16 at 523–130 (15th ed. 1993); *see Thorp Credit & Thrift Co. v. Pommerer (In re Pommerer ),* 10 B.R. 935, 940 (Bankr.D.Minn.1981).

Although defined by courts in various ways, conversion is generally defined as the wrongful assumption or exercise of dominion over the property of another in a manner which is inconsistent with, or in defi-

---

6. The preponderance of the evidence standard has been defined by the Eighth Circuit Court of Appeals as follows:

> It is the evidence which, when weighed with that opposed to it as more convincing force and is more probably true and accurate. If upon any issue in the case, the evidence ap-

pears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then plaintiff has not met his or her burden of proof.

*Smith v. United States,* 726 F.2d 428, 430 (8th Cir.1984).

ance of, the true owner's rights. *Wightman*, 36 B.R. at 252; *Dakota Bank and Trust Co. v. Brakke*, 404 N.W.2d 438, 443 (N.D.1987). Additionally, the concept of unlawful conversion encompasses the utilization of the property of another which is placed in one's custody for a limited purpose in an unauthorized manner or to an unauthorized extent. Of significant import in light of the circumstances of this action is the fact that the law of conversion applicable to personal property is equally applicable to instruments such as checks.[7] *See* N.D.Cent.Code § 41–03–57(1) (U.C.C. § 3–420) (Supp.1993). *See also* 18 Am.Jur.2d *Conversion* § 17 (1985); 89 C.J.S. *Trover & Conversion* § 13 (1955); Annotation, *Nature of Property or Rights other than Tangible Chattels which may be Subject to Conversion*, 44 A.L.R.2d 927 (1955).

▪ The United States Bankruptcy Court for the Western District of Missouri set forth the following criterion when analyzing conversion in conjunction with § 523(a)(6):

> In determining whether a defendant has committed a conversion, the standard is whether the defendant has clearly exercised dominion over the chattel in a manner which is contrary to the plaintiff's claim of ownership or right of possession. "Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's right." *Houston v. Columbia Fed. Sav. & Loan Assn.*, 569 S.W.2d 211, 214 (Mo.App.1978). "The law of conversion is concerned with possession, not title, its essence is not in the acquisition of the property by the wrongdoer, but in the wrongful deprivation of it to the owner. There need only be some repudiation of the owner's right or some exercise

of dominion over it inconsistent with some right." *Price v. Ford Motor Credit Co.*, 530 S.W.2d 249, 255 (Mo.App.1975). "Proof of conversion can be shown either by: (1) a tortious taking, or (2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the rights of the owner, or (3) by a refusal to give up possession to the owner on demand." *Houston v. Columbia Fed. Sav. & Loan, Assn., supra*, at 214; *Arnold v. Prange*, 541 S.W.2d 27, 30 (Mo. App.1976)....

> In determining whether a particular defendant is liable for a conversion, the criterion is whether that defendant either participated in the conversion or benefitted from it. "Every person is liable in trover who personally or by agent ... commits an act of conversion by instigating, aiding or assisting another, or who knowingly benefits from its proceeds in whole or part." *Victor Fed. Sav. & Loan Ass'n v. Robison (In re Robison)*, 86 B.R. 182, 184 (Bankr. W.D.Mo.1988). From the foregoing, it is readily apparent that the duty not to convert the funds or property of another inheres from the fact that the ownership of such is in another person.

▪ Conversion of a negotiable instrument such as a check occurs when it is paid on a forged endorsement since the payment thereon deprives the payee-owner of the value it represents. Accordingly, such conduct constitutes the wrongful exercise of dominion over the property of another inconsistent with the rights of the true owner. In this action, it is clear that a prima facie case of conversion was established against the defendant by undisputed evidence that Lacina obtained possession of the checks and repeatedly forged the payee's endorsement

---

7. With respect to the conversion of instruments, the North Dakota Century Code provides:

The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is purchased from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by the issuer or acceptor of the instrument or by a payee or

endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or copayee.

N.D.Cent.Code § 41–03–57(1) (U.C.C. § 3–420) (Supp.1993). From the foregoing, it is clear that a payee receives delivery of a check, and accordingly can maintain a cause of action for conversion of the instrument, when it comes into its possession. Moreover, delivery to an agent constitutes delivery to the payee thus giving the payee rights in the instrument.

and appropriated the proceeds therefrom solely for personal use.[8] Thus, when a negotiable instrument such as a check is converted by payment on a forged endorsement, the payee-owner has suffered an "injury" to property within the meaning of § 523(a)(6).

Although a conversion clearly constitutes an "injury", the injury must be "willful and malicious" in order to be excepted from discharge.[9] A claim founded on a mere technical conversion which is precipitated by a misunderstanding or mistake without a conscious intent to violate the rights of another is dischargeable. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *Victor Fed. Sav. & Loan Ass'n v. Robison (In re Robison )*, 86 B.R. 182, 184 (Bankr.W.D.Mo.1988); *Production Credit Ass'n of Grafton v. Clark (In re Clark )*, 50 B.R. 122, 125 (Bankr. D.N.D.1985); 3 *Collier on Bankruptcy,* ¶ 523.16 at 523–137 (15th ed. 1993). Although "willful and malicious" in reference to the state of mind of a wrongdoer in creating a dischargeable debt is not defined in the Code, the words are terms of art that each constitute a separate element with separate characteristics.[10] *Bosch v. Bumann (In re Bumann )*, 147 B.R. 44, 47 (Bankr.D.N.D. 1992). Moreover, the Eighth Circuit Court of Appeals has expressly held that the "will-

ful" and "malicious" standards must *both* be met under a dual analysis by a fair preponderance of the evidence since the statute presents the terms in the conjunctive:

Congress tells us in § 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable.

*Barclays American/Business Credit, Inc. v. Long (In re Long )*, 774 F.2d 875, 880–81 (8th Cir.1985).

The element of "willfulness" is demonstrated by evidence that the defendant acted deliberately or intentionally rather than merely negligently or recklessly. *Johnson v. Miera (In re Miera )*, 926 F.2d 741, 744 (8th Cir.1991); *In re Long*, 774 F.2d at 880 (noting that there exists a "virtual consensus" that willful means intentional or deliberate); *In re Bumann*, 147 B.R. at 47; H.Rep. No. 595, 95th Cong., 2d Sess. 365 (1978); *available in* 1978 U.S.C.C.A.N. 5963, 6320. The "willfulness" element has been further clarified Eighth Circuit Court of Appeals as conduct which is "headstrong and knowing". *In re Long*, 774 F.2d at 881. In this regard, the evidence was abundantly clear that Lacina, as a relatively long-time

---

**8.** It is undisputed that at no point did Lacina have a legitimate claim to the forged checks. The checks clearly belonged to Dahlgren; they were not for the personal use of Lacina. When he received the checks specifying Dahlgren as the payee, he was obliged to remit them to the company in accordance with the dealership agreement.

It has been said that conversions "are of two classes, where possession is originally wrongful, and where possession originally rightful becomes wrongful by wrongful detention." 89 C.J.S. *Trover & Conversion* § 3 (1955) (footnotes omitted). In this case, the possession of the checks by Lacina was originally rightful since it was the dealer's responsibility to collect payment for the seed that was sold. However, the subsequent exercise of unauthorized dominion over the checks by converting the proceeds therefrom to personal use was wrongful.

**9.** At least one circuit court of appeals has expressly held that the commission of the intentional tort of conversion always satisfies the requirements of § 523(a)(6). *See Vulcan Coals, Inc. v. Howard,* 946 F.2d 1226, 1229 (6th Cir.1991).

**10.** It should be noted that since the enactment of the Bankruptcy Reform Act of 1978, courts have utilized a variety of differing approaches when interpreting the Code's "willful and malicious" exception, with the primary basis for the divergence resting upon the definition of "malice". *See Victor Fed. Sav. & Loan Ass'n v. Robison (In re Robison )*, 86 B.R. 182 (Bankr.W.D.Mo.1988); *United Bank of Southgate v. Nelson,* 35 B.R. 766 (N.D.Ill.1983); Karen N. Fischer, *The Exception to Discharge for Willful and Malicious Injury: The Proper Standard for Malice,* 7 Bankr.Dev.J. 245 (1990); Shawn M. Blatt, Comment, *Section 523(a)(6): Willful and Malicious Exception from Discharge: The "Implied Malice" Standard,* 16 U.Dayton L.Rev. 155 (1990); Deborah A. Ballam, *The "Willful and Malicious" Injury Exception to Discharge in Bankruptcy: An Analysis and Recommended Revision,* 28 Am.Bus.L.J. 87 (1990) (for thorough discussions on the disparity of approaches taken by courts in construing the willful and malicious exception to discharge and historical development of § 523(a)(6)).

and experienced dealer of Dahlgren seed, had a thorough understanding that he was acting in contravention of Dahlgren's interest by repeatedly forging the Dahlgren endorsement on a substantial number of checks and purposefully appropriating the proceeds therefrom for his personal use. Lacina could not legitimately aver that he was operating under a mistaken belief as to the propriety of his conduct at the time he was forging the instruments. His intent to disregard Dahlgren's interest and proceed irrespective of his knowledge of that interest has been established by the facts and meets the willfulness requirement of § 523(a)(6).

▆▆▆▆▆ The term "maliciousness" is less susceptible to an exacting definition and has always been a difficult concept for courts when attempting define an applicable standard. *Production Credit Ass'n v. Clark* (*In re Clark*), 50 B.R. 122, 124 (Bankr.D.N.D. 1985). As a concept, this court has recognized that:

'The search for malice is always a perplexing exercise, dealing as it does with a brooding malevolence, a private design for harm, from which society seeks protection in the law. Easy to deny and hard to prove, the secret state of mind may be laid bare, if at all, by a reference to the acts of its creator.'

*Id.* (quoting *In re Cooney*, 18 B.R. 1011 (Bankr.W.D.Ky.1982)). It is, however, clear that the "maliciousness" element of § 523(a)(6) requires a heightened level of culpability beyond mere willfulness. *In re Bumann*, 147 B.R. at 47. In this circuit, the debtor's conduct to be malicious must be "targeted at the creditor ... at least in the sense that the conduct is certain or almost certain to cause financial harm." *In re Long*, 774 F.2d at 881. Stated differently, this element tests whether the defendant's conduct was in fact, or should have been reasonably recognized to be, certain to cause harm to the plaintiff. *In re Robison*, 86 B.R. at 185. While the malice standard does not require a personal animosity, spite or ill will, a wrongful act is malicious if it is if "done intentionally, without just cause or excuse, and with the intent to injure" or there exists a "knowing wrongfulness or knowing disre-

gard of the rights of another." *Skaarer v. Fercho* (*In re Fercho*), 39 B.R. 764, 767 (Bankr.D.N.D.1984). In language subsequently approved by Eighth Circuit Court of Appeals in *In re Long, supra,* this court in defining an applicable standard for malice in this district has held that a debtor is charged with the knowledge of the natural consequences of his or her actions:

[A]n injury is wilful and malicious if the debtor knew that an injury would be caused and proceeded in the face of this knowledge to carry out the actions which would cause such injury. The restatement (second) of torts, section 8a, comment b, is instructive in determining whether such an intent to harm is present, stating:

All consequences which the actor desires to bring about are intended.... Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness.... As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence....

*Id.* (quoting Restatement (Second) of Torts § 8a, cmt. b (1965)). *See In re Long,* 774 F.2d at 881. Hence, an act may be "willful and malicious" in this circuit even absent a specific subjective intent to injure. Although "intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent." *In re Long,* 774 F.2d at 881.

▆▆▆ Malice is established in the instant case by overwhelming proof that the debtor acted with the knowledge that the creditor's economic interests would be, or could reasonably be expected to be, harmed through the unauthorized exercise of dominion over the checks and corresponding proceeds. Despite the defendant's express denial of any intention to harm the plaintiff in this case, the

facts and surrounding circumstances demonstrate the contrary. Lacina's conduct was unquestionably targeted at Dahlgren in his surreptitious efforts to conceal his actions by deliberately failing to forward the remittance forms to Dahlgren in connection with only those sales in which he converted the checks, and was certain to cause harm when none of the checks from the sale ever reached—or at the time of the conversions were ever intended to reach—Dahlgren. Lacina deliberately failed to comply with the terms of the dealership agreement and in conscious disregard thereof engaged in a calculated endeavor which resulted in the appropriation of the proceeds from the sales of seed in a manner which undoubtedly would give rise to the imposition of criminal liability in another forum. The relatively long period through which Lacina repeatedly forged the instruments and converted the proceeds therefrom to personal use while withholding of remittance forms from Dahlgren betoken a state of mind which can be fairly characterized as "malicious".

The determination of a defendant's intent is a question of fact. *First Nat'l Bank v. Sisemore (In re Phillips)*, 882 F.2d 302, 305 (8th Cir.1989). A court, as trier of fact, is not confined to a defendant's self-justifying testimony. A mere naked expression of an intent repay the converted proceeds in the instant case in the face of inappropriate and irregular conduct is a meretricious defense particularly where that conduct is undertaken under circumstances which, when viewed objectively, evince a floundering state of financial affairs.

This court is satisfied from the totality of the evidence that the element of malice has been established in accordance with the requisite degree of proof and, when coupled with the element of willfulness, meets the requirements of nondischargeability under 11 U.S.C. § 523(a)(6). Accordingly, IT IS ORDERED that judgment be entered in favor of Dahlgren & Company, Inc., and against the defendant-debtor, James E. Lacina, in the sum of $44,121.45 said sum being nondischargeable in bankruptcy.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**