In re Elmer Dale SATEREN, Debtor.

Erika SATEREN, Plaintiff,

v.

Elmer Dale SATEREN, Defendant.

Bankruptcy No. 94–30923.
Adv. No. 95–7003.

United States Bankruptcy Court,
D. North Dakota.

May 18, 1995.

**578**

Douglas Christensen, Grand Forks, ND, for plaintiff.

Kevin Spaeth, Grand Forks, ND, for defendant.

## MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The plaintiff-creditor, Erika Sateren (Erika), commenced the above-entitled adversary proceeding by Complaint filed on January 11, 1995, seeking to have obligations stemming from a state court divorce decree declared nondischargeable pursuant to 11 U.S.C. § 523(a)(5), (a)(6), and (a)(15). The defendant-debtor, Elmer Dale Sateren (Elmer), generally denies the allegations contained in the Complaint.

The instant action represents the latest skirmish in the parties' five-year domestic battle. A brief discussion of the protracted procedural history of this case in the state courts is warranted in order to clarify its present posture. The parties to this dispute were embroiled in a divorce proceeding which culminated in a judgment of divorce as well as an award that provided for the distribution of the marital estate. The trial court rendered certain findings of fact and conclusions of law in connection with the award and judgment, which were subsequently appealed by Erika to the North Dakota Supreme Court. The supreme court reversed the trial court's determination and remanded the case with instructions. The trial court amended its judgment and made a new award in a manner consistent with the direction of the supreme court. It is this award with which the court is now concerned and Erika is seeking to have declared nondischargeable.

Trial was held on May 4, 1995. From the evidence presented and the arguments made, the court finds the facts set forth herein material to the resolution of the case and makes the following conclusions of law:

### FINDINGS OF FACT

Elmer and Erika Sateren met in Germany in 1960 while Elmer was in the military. The couple married in 1962 and returned to North Dakota in 1967. Shortly after their return to North Dakota, the couple purchased a small farming operation title to which they held as tenants in common. The proceeds for the farm purchase came from joint earnings. Both Elmer and Erika actively worked the farm. Erika assumed the primary responsibility for raising the children of the marriage as well as the household duties. She also maintained outside employment during the course of the marriage and put the money she earned into the farming operation.

The couple separated in 1990 and Erika commenced a divorce action. Elmer was ordered to pay $300.00 per month in interim or temporary support. Elmer was also ordered to provide health insurance for Erika and to pay any medical expenses she might incur during the pendency of divorce action.

Erika enrolled at the University of North Dakota in August of 1990 and will be obtaining a degree in May of 1995. Her general career field is in linguistics and she, at least at one point, hoped to be an interpreter. Although Erika utilized the funds received as temporary support to help finance her living and educational expenses while at the university, she was forced to procure additional funds for her education from various lenders. Consequently, Erika has incurred approximately $16,500 worth of educational indebtedness, the payments on which will become due in 6 months.

After giving due consideration to the parties' respective situations in light of governing North Dakota law, the divorce court made the following distribution of the marital assets:

| Asset | Value | Erika | Elmer |
|---|---|---|---|
| Cattle | $5,000 | $2,500 | $2,500 |
| Machinery | $22,000 | $0 | $22,000 |
| Topaz Car | $2,400 | $1,400 | $0 |
| Stored Grain | $7,780 | $3,890 | $3,890 |
| Real Property | $40,780 | $0 | $40,780 |
| **Total** | **$76,960** | **$7,790** | **$69,170** |

As the preceding table illustrates, Elmer was awarded the family farm together with the machinery necessary to work the land. Erika was awarded ½ of the cattle and stored grain. The trial court's order, dated July 10, 1991, made it abundantly clear that the basis for the allocation of marital assets was to enable the parties to pursue their respective vocations:

> The property must be allocated in a manner that will allow both parties to work towards their future employment goals.

> Elmer is age 53, farming is the only occupation he knows. It is not necessary for the court to force him out of farming. Both parties should be given their best available opportunity to follow their chosen work.... An equal distribution of property would surely force Elmer out of farming.

In an attempt to equalize the obvious disparity in property distribution and to compensate Erika for her interest in the marital assets, the court ordered Elmer to pay off the debts related to the real estate and the farming operation in the amount of $20,449 and ordered Elmer to pay Erika an amount aggregating $18,000. That amount was to be made in equal payments of $300 per month for 60 months and was thought by the trial court to enable Erika to continue with her education.

The divorce court expressly found that Elmer was not, financially, in a position to provide rehabilitative spousal support in light of his debt burden and limited earnings. As such, the court, noting that Erika had demonstrated the ability to continue her education on the $300 per month that Elmer was paying as interim support and that this amount would be the equivalent of what she would be receiving for her interest in the marital estate, found that "additional spousal support" was not warranted. *See* Plaintiff's Exhibits 1 & 2. Erika appealed the trial court's determination to the North Dakota Supreme Court arguing, inter alia, that the court erred by failing to award her rehabilitative spousal support.

The North Dakota Supreme Court reversed the trial court and remanded the case for further consideration. The supreme court, while agreeing that Elmer was unable to make periodic payments in connection with a property division concurrently with payments for rehabilitative spousal support, found that Erika's situation was such that rehabilitative support was necessary. *Sateren v. Sateren,* 488 N.W.2d 631, 634 (N.D. 1992). The court also found it unfair to allow Elmer to retain an income-producing asset while requiring Erika to utilize her property settlement to obtain her college degree. *Id.* at 634–35. *See generally Heley v. Heley,* 506 N.W.2d 715, 720 (N.D.1993); *Pfliger v. Pfliger,* 461 N.W.2d 432, 436 (N.D.1990). Consequently, the court remanded the case to the trial court with the instruction that spousal support be awarded. In order to best accommodate Erika's needs as well as Elmer's

limited ability to pay, the court was directed to consider structuring the periodic payments in a manner which would make the payment of the obligations representing *both* spousal support and property distribution possible. *Sateren,* 488 N.W.2d at 635 & n. 3.

On remand, the trial court amended its judgment to provide for the payment of *both* rehabilitative spousal support in addition to the amount previously adjudged to compensate Erika for her interest in the marital property. The property settlement, which was specifically denoted as such, was in the amount of $18,000. The trial court, consistent with the instruction of the North Dakota Supreme Court, ordered Elmer to pay Erika spousal support in periodic installments of $300 per month for 18 months (January, 1993 through June, 1994). The court gave Elmer three alternatives for effectuating the payment of the property settlement and spousal support award. Alternative 3, the only alternative applicable to this case, required Elmer to first pay the spousal support award through periodic payments and then required Elmer to pay the property settlement through periodic payments which included an amount compensating for the time value of money. *See* Plaintiff's Exhibits 3 & 4. The court also ordered Elmer to pay Erika the sum of $546.90 for costs associated with prosecuting the appeal of the trial court's denial of spousal support.

With the exception of a spousal support arrearage of $600 and an interim support and health cost arrearage of $3,360, to which the defendant-debtor concedes are nondischargeable under § 523(a)(5), Elmer has completed the periodic support payments. Elmer has not, however, made any payment toward the $18,000 property distribution and has not paid the $540.90 in costs associated with prosecuting the appeal. Additionally, Elmer readily concedes selling the cattle and the stored grain, valued at $6,390, that were specifically awarded to Erika by the trial court as part of the distribution of the marital assets. The cattle and grain sales were effectuated shortly after the divorce court made its award and Elmer retained the proceeds from the sales thereof entirely for personal use. Elmer further acknowledged

knowing that the cattle and grain were subject to a court order and that Erika had a proprietary interest in the property when it was sold.

Erika brought a motion for civil contempt on August 22, 1994, due to Elmer's failure to comply with the court's amended judgment. By her motion, Erika sought, among other things, to impress the real estate awarded to Elmer with a judicial mortgage lien in order to secure her interest in the marital property. Elmer filed for relief under Chapter 7 of the United States Bankruptcy Code on October 11, 1994, eleven days *prior* to the enactment of the Bankruptcy Reform Act of 1994.

## CONCLUSIONS OF LAW

Bankruptcy law is grounded on the public policy of affording the honest, but unfortunate, debtor with an economic fresh start by permitting the discharge of prepetition indebtedness. Bankruptcy law does, however, limit a debtor's ability to discharge certain obligations by statutorily excepting certain debts from discharge. The exceptions from discharge are found at § 523 of the Bankruptcy Code and are essentially the product of countervailing policy considerations in which the scales of justice tip in favor of certain creditors by allowing select categories of obligations to remain virtually unscathed by the bankruptcy discharge. The exceptions from discharge are, however, construed liberally in favor of the debtor. Moreover, the burden of establishing a basis for nondischargeability falls squarely upon the shoulders of the objecting creditor. *Grogan v. Garner,* 498 U.S. 279, 283–91, 111 S.Ct. 654, 657–61, 112 L.Ed.2d 755 (1991). *See Sampson v. Sampson (In re Sampson),* 997 F.2d 717, 722 (6th Cir.1993); *Gianakas v. Gianakas (In re Gianakas),* 917 F.2d 759, 761 (3d Cir.1990); *Benich v. Benich (In re Benich),* 811 F.2d 943, 944 (5th Cir.1987); *Long v. West (In re Long),* 794 F.2d 928, 930 (4th Cir.1986); *Gionis v. Wayne (In re Gionis),* 170 B.R. 675, 683 (9th Cir. BAP 1994); *Gard v. Gibson (In re Gibson),* 103 B.R. 218 (9th Cir. BAP 1989); *Catalona v. Holdenried (In re Holdenried),* 178 B.R. 782, 787 (Bankr. E.D.Mo.1995); *Hillius v. Hillius (In re Hil-*

*lius Farms)*, 38 B.R. 334, 336 (Bankr.D.N.D. 1984). *See also* Fed.R.Bankr.P. 4005.

■ Erika argues that the obligations imposed by the judgment of the divorce court should be excepted from discharge under § 523(a)(15). The argument is without legal merit. The Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106 (1994), was signed into law by President Clinton on October 22, 1994. The Act, which established § 523(a)(15) as a new subsection, became effective immediately upon enactment and, for the most part, provided for prospective application of the law. It therefore applies only to cases commenced *after* the date of enactment. *See* H.R.Rep. No. 5116, 103d Cong., 2d Sess. § 702, at 114–15 (1994) (indicating that "the amendments made by [the] Act shall not apply with respect to cases commenced under title 11 of the United States Code before the date of the enactment of [the] Act."). The Chapter 7 petition in this case was filed on October 11, 1994. Consequently, and unfortunately for Erika, § 523(a)(15) is simply not an available avenue of relief in this case.

■ Congress enacted § 523(a)(5) in an effort to resolve the conflict between the fresh start policy of the bankruptcy discharge and the family law policy which recognizes the need of ensuring the necessary financial support for the disadvantaged spouse after the termination of the marriage as well as an equitable distribution of marital property. Therefore, 11 U.S.C. § 523(a)(5) excepts from discharge any debt owed to a former spouse for alimony to, maintenance for, or support of such spouse provided that the obligation is "actually in the nature of *support.*" 11 U.S.C. § 523(a)(5). Obligations which can fairly be characterized as merely property settlements do not fall within the ambit of Code § 523(a)(5).

■ In ascertaining whether a particular obligation is actually in the nature of a nondischargeable "support" obligation or more properly represents a dischargeable property distribution or settlement, it is universally agreed that the critical inquiry is the function the particular award was intended to serve at the time of entry of the state court decree of dissolution. *Adams v. Zentz*, 963 F.2d 197, 200 (8th Cir.1992); *Williams v. Williams (In re Williams)*, 703 F.2d 1055, 1057 (8th Cir.1983); *Sadowsky v. Larson (In re Larson)*, 169 B.R. 945, 952–53 (Bankr. D.N.D.1994); *Streich v. Osterberg*, 109 B.R. 938, 941 (Bankr.D.N.D.1990); *McConnell v. McConnell (In re McConnell)*, 88 B.R. 218, 221 (Bankr.D.N.D.1988). Section 523(a)(5) does not contemplate an ongoing assessment of need as the circumstances of the parties change. *Harrell v. Sharp (In re Harrell)*, 754 F.2d 902, 906–07 (11th Cir.1985); *Edwards v. Edwards (In re Edwards)*, 172 B.R. 505, 512 (Bankr.D.Conn.1994). As such, neither the circumstances existing at the time of the bankruptcy filing nor the present situation of the respective parties is relevant to the determination of whether a particular obligation can legitimately characterized as support. *Boyle v. Donovan*, 724 F.2d 681, 683 (8th Cir.1984). To conclude otherwise and give consideration to the parties' present circumstances in making a nondischargeability determination under § 523(a)(5), as Erika would presently have this court do, would in effect result in a modification of an order of the divorce court and a usurpation of the state court's traditional role in establishing and modifying familial obligations.

■ Although the critical inquiry centers on determining the underlying purpose of the debt, it is frequently difficult for a bankruptcy court to classify awards neatly into either the category of support or property division since there is often an inextricable relationship between spousal support and a distribution of marital property. *See Sateren v. Sateren*, 488 N.W.2d 631, 634 & 635 (N.D. 1992) (acknowledging that the issues of property division and spousal support are overlapping). Indeed, a division of marital property is often employed as a substitute for alimony by providing the disadvantaged spouse a means for rehabilitation and self support. Section 523(a)(5), however, essentially requires the bankruptcy court to employ federal standards aimed at making dichotomous classifications. This court has previously opined that "[a]n obligation stemming from a property division is usually premised upon each spouse's respective

rights to an equitable share of property, acquired during the marriage for their mutual benefit. Spousal support, by contrast, generally serves the functions of providing maintenance and rehabilitative support." *In re Larson,* 169 B.R. at 952. Thus, the very theory of property division is based on an allocation of assets acquired during the marriage.

Elmer readily acknowledges that the support arrearage of $600 and the interim support health cost arrearage of $3,360 are actually in the nature of support and therefore nondischargeable under § 523(a)(5). The court has little trouble in concluding that Elmer's obligation to make periodic payments having the discounted value of $18,000 was intended to serve as a distribution of the marital estate or a dischargeable property settlement. It is the history of this case and the record of the state court proceedings which are telling. The divorce court in its original order concluded that Elmer was incapable of providing for rehabilitative spousal support. The trial court ruled that the periodic payments that Elmer was required to make as part of the property distribution would enable Erika to obtain her college degree. If the state of the proceedings ended at that point, this court would more than likely be in a position to conclude that the property distribution was intended to largely serve a support function. However, there is more to the history of this case. Erika appealed the trial court's denial of rehabilitative spousal support to the North Dakota Supreme Court. The supreme court reversed the decision of the divorce court and remanded the case with the instruction that rehabilitative spousal support be awarded. In doing so, the supreme court instructed the trial court to draw clear lines of demarcation between the spousal support award and the property settlement. The court was clearly attempting to achieve economic parity and trying to preserve the property distribution award for Erika while at the same time provide her with a modest amount of rehabilitative support. The trial court on remand amended its judgment and thereby made separate provisions for rehabilitative spousal support and the property distribution. Indeed, the obligations were structured in such a fashion that would enable Elmer to pay both awards. The court's order permitted Elmer to pay the awards consecutively through a stream of periodic payments—the support award first, followed by the property settlement. Although courts are not bound by labels, it is worth noting that the property distribution or settlement was denominated as such both by the court in its order and, ironically, by Erika in her stipulation of facts on file with the court. *See generally Morel v. Morel (In re Morel),* 983 F.2d 104, 105 (8th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 2423, 124 L.Ed.2d 645 (1993).

Costs and attorney's fees awarded in connection with the enforcement of a support order or determination can readily be found to be actually in the nature of support and, therefore, nondischargeable under § 523(a)(5). *See, e.g., Jones v. Jones (In re Jones),* 9 F.3d 878 (10th Cir.1993); *Williams v. Williams (In re Williams),* 703 F.2d 1055 (8th Cir.1983); *Lathouwers v. Lathouwers (In re Lathouwers),* 54 B.R. 205 (Bankr.D.Colo.1985); *Anderson v. Barth (In re Barth),* 37 B.R. 357 (Bankr.D.N.D.1984). As such, the court finds that the costs in the amount of $540.90 awarded to Erika incident to and in connection with prosecuting the appeal of the trial court's denial of spousal support are nondischargeable.

Code § 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another...." 11 U.S.C. § 523(a)(6). Courts have uniformly held that a "conversion of another's property without his knowledge or consent, done intentionally and without justification or excuse," to another economic injury, may readily constitute a "willful" and "malicious" injury within the meaning of § 523(a)(6). 3 *Collier on Bankruptcy* ¶ 523.16, at 523–130 (Lawrence P. King et al. eds., 15th ed. 1994). It is therefore well settled that actions taken in derogation of the property interests of another may constitute a conversion redressable by § 523(a)(6). *See, e.g., Dahlgren & Co., Inc. v. Lacina (In re Lacina),* 162 B.R. 267 (Bankr.D.N.D.1993).

Section 523(a)(6) requires the confluence of both the elements of willfulness and maliciousness. Willfulness simply means conduct that is intentional or deliberate. *Johnson v. Miera (In re Miera)*, 926 F.2d 741, 744 (8th Cir.1991). Although the element of maliciousness requires a heightened level of culpability transcending mere willfulness, it does not require a showing of spite, ill will, personal animosity, or a subjective intent to injure. *In re Lacina*, 162 B.R. at 275. Rather, the malice element tests whether the debtor's actions, when undertaken, were in fact, or should reasonably have been recognized to be, certain to cause financial harm to the plaintiff. *Id.* In this vein, a debtor is charged with natural consequences of his actions. *Id. See Erickson v. Roehrich*, 169 B.R. 941, 945 (Bankr.D.N.D.1994) (opining that the element of malice as required for § 523(a)(6) is satisfied if the debtor acts in knowing disregard of the rights of another).

The divorce court in the case at bar expressly awarded Erika ½ of the cattle and the stored grain pursuant to a judgment of divorce valued at $2,500 and $3,890 respectively. She therefore acquired a clearly defined and legally enforceable proprietary interest in those marital assets. Elmer unquestionably acted in willful derogation of those interests when he, fully cognizant of the letter and import of the court's order and judgment, sold those assets and converted the proceeds therefrom to his personal use without Erika's consent within a relatively short time after the court's order. Elmer offered no explanation whatsoever for his actions and the court has little trouble in concluding that he acted in knowing contravention of the court's order in order to deprive Erika of her economic interest in those assets. The court is satisfied that the elements of willfulness and maliciousness have been established in accordance with the requisite degree of proof sufficient to render the obligations nondischargeable under § 523(a)(6).

Accordingly, and for reasons stated, IT IS HEREBY ORDERED that judgment be entered in favor of the plaintiff-creditor, Erika Sateren, and against the defendant-debtor, Elmer Dale Sateren, in the sum of $10,890.90 together with prejudgment interest, said sum being nondischargeable in bankruptcy.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**