In re Klayton KUBIK, Debtor.

Devonna Dee KUBIK, Plaintiff,

v.

Klayton KUBIK, Defendant.

Bankruptcy No. 96–31381.
Adversary No. 97–7009.

United States Bankruptcy Court,
D. North Dakota.

Nov. 19, 1997.

Gary D. Ramsey, Dickinson, ND, for Plaintiff.

Charlie Stock, Fargo, ND, for Defendant.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding was commenced by Complaint filed January 13, 1997, by which the Plaintiff, Devonna Dee Kubik (Dee) seeks a determination that an outstanding mortgage obligation on the family home which the Debtor, Klayton Kubik (Klay) assumed pursuant to a divorce decree, and a resulting $29,591.76 money judgment, constitute nondischargeable maintenance and support under § 523(a)(5) of the United States Bankruptcy Code. Alternatively, she requests that the obligation be determined nondischargeable under § 523(a)(15). Klay generally disputes the characterization of the divorce award as alimony or support, further alleging that he does not in any event have the means to pay the debt.

Trial was held on October 28, 1997. From the evidence presented and the facts as stipulated to, the court finds the facts as material to be as follows:

### Findings of Fact

#### 1.

After a seven year and sometimes troubled marriage, the parties were divorced in December 1995 on the grounds of irreconcilable differences. Following an extended trial, the state district court made detailed findings and conclusions of law whereby Dee was awarded custody of the three minor children born of the marriage as well as a minor child born of a prior marriage, the court believing it important that they retain continuity in their home, school and community environment. In awarding child support of $656 per month the state court discussed at some length the couple's financial difficulties and Klay's struggles to preserve several business ventures. The court concluded in its opinion that Klay, being possessed of vocational talents, had the ability to provide substantial

support for himself and the children. Although the decree specifically states that neither party will be obligated to provide any form of spousal support, it does purport to make a distribution of the real and personal property of the parties. In making its determination to award Dee sole title to the home and, in turn, make Klay responsible for the mortgage, several factors were significant to the state court, to wit:

"It seems important to try to preserve for Dee and the children the marital home they have established in Dickinson. Both parties recognize that they have a substantial home for the children to live in only because of the substantial gift made to them by Dee's parents of approximately $55,000."

Klay was ordered to obtain a satisfaction of the mortgage by January 15, 1996, and failing to do so, his remaining assets would be liquidated with the proceeds applied to reduce the mortgage. Any unsatisfied balance remained Klay's obligation as a part of the property division and he was to hold Dee harmless therefrom.

As circumstances developed, the mortgage was not satisfied by the court-established deadline prompting a liquidation of Klay's remaining assets. After applying the proceeds to the debt there remained an unsatisfied balance of $29,122.16 owing to the mortgagee, Security Bank of Hebron. Faced with foreclosure, Dee paid the balance through a loan from her parents (to whom she remains indebted) and then sought and obtained from the state court a supplemental money judgment against Klay in the sum of $29,561.76. This sum remains unsatisfied and is the claim upon which Dee rests the instant proceeding.

2.

At the time of the divorce Dee was 40 and Klay was 37. Dee had a four-year nursing degree and worked as a registered nurse from 1987 to 1994 when certain difficulties, later discussed, caused her to start a home-based day care. At the time of the divorce she was earning $8,000 per year from the day care operation. By 1996 her income from this source had grown to $12,000. Klay grew up on his family farm and has considerable farm-related job experience. He graduated with an associate degree in business management from North Dakota State School of Science and has both training and experience as an insurance salesman. In 1993 he started bartending part-time which lead to a general manager position at a restaurant. Both he and Dee also began an association with Amway—an association Klay presently maintains. During the marriage most of his time and finances, as noted by the state court, were devoted towards saving the Kubik family farm in Dunn County and a bar owned by his father in Manning, North Dakota. Both of these businesses eventually failed despite considerable cash infusions and debt forgiveness.

Klay is under no apparent health or other handicaps and is presently employed as a corrections officer in addition to the Amway business. His earning potential is hampered to some degree by his expressed desire to remain close to his children who reside in Dickinson.

Dee, on the other hand, suffers from alcoholism and during the marriage she received several inpatient treatments. As a consequence of this addiction and incidents involving falsification of patient care records, shoplifting and reckless driving, she lost her nursing license prompting her move into day care.

In 1994, the parties purchased a home now occupied by Dee for $80,000 with the bulk of the funds coming from proceeds of a sale of land she had received as a gift from her parents. The home was acquired debt-free and remained so until Klay's farming difficulties came to a head in 1994, when as part of an FmHA loan buy down, Klay needed collateral to secure a loan from the Security Bank of Hebron. In August of that year the bank made a $76,000 loan to the parties secured by a mortgage on the formerly debt-free family home. At the time of the divorce the outstanding obligation owing the bank was $76,000 plus accrued interest. After debt reduction in the manner ordered by the state court it was reduced to $29,591.76.

In fashioning a division of property, the state court struggled with the precarious fi-

nancial position both parties were then in but nonetheless the court was quick to assign significant economic fault to Klay because of his failure to provide the family with even minimal financial support despite being able-bodied and talented in many fields of endeavor. Klay was awarded virtually all income-producing property including a considerable amount of farm machinery consisting of tractors, combine, baler, drill, disc, mower, swather and other items essential to a farming/ranching operation. He was also awarded ten head of cattle along with twenty-five bales of hay and straw. Against this significant amount of property was an indebtedness of approximately $15,000 which he was responsible for. Dee, on the other hand, was awarded no income-producing property. Rather, she was given the home together with furniture and appliances all encumbered by approximately $85,000 in debt-a debt Klay was to assume and hold her harmless from.

Since the divorce Dee has remained in the family home with the four minor children. She presently runs the home-based day care facility earning approximately $1,800 per month gross on average with summer months being the strongest. In 1997 her actual income derived from the day care was $19,000 gross for the months January through September with expenses of $4,600 bringing her net income from the day care to $14,548 for the nine-month period. Assuming the actual business income and expense figures for these nine months bears out to the end of the year, Dee's 1997 net income from the day care will be approximately $18,000. In addition to day care income she has received child support income of $5,120 over the nine-month period and assuming Klay maintains payments as ordered by the court she will receive an additional $2,070 by year end. Thus, for 1997 her net cash income from these two sources may well be $25,000. Monthly living expenses for herself and the children total $2,000 per month or $24,000 per year.

Klay presently works part-time as a corrections officer earning $8.50 per hour. He hopes this will develop into a full-time position but is unsure of that prospect. In addition to his corrections officer job he receives minimal income from his Amway business and insurance residuals. From January 1997 to October his total net income was $4,573—an amount he acknowledges he cannot live on. He is presently residing with his parents to reduce living expenses which he estimates at $1,800 per month inclusive of the child support obligation and health insurance which he is not presently paying. Klay acknowledges that he is in good health, able-bodied and capable of physical work. In the past he has held a variety of jobs as before noted, but enumerates a litany of reasons why he has been so remarkably unsuccessful. He does not want to live too far from his children and wants to be around weekends for visitation. He does not want to pursue the insurance business because it is too time-consuming, in his opinion. He professes to have faith in the Amway business and feels it could generate around $40,000 per year if he could stock product properly.

### Conclusions of Law

■ Section 523(a)(5) excepts from discharge any debt owed to a former spouse or child of the debtor for alimony to, maintenance for, or support of such spouse when awarded in connection with a "divorce decree or other order of a court of record" if the obligation is "actually in the nature of alimony, maintenance, or support." 11 U.S.C. § 523(a)(5). In contrast, property settlements are dischargeable unless they come within the ambit of § 523(a)(15).

■ Whether a particular debt is a support obligation nondischargeable under § 523(a)(5) or is a property settlement is a question of federal law to be determined by the substance of the liability rather than its form or how it is characterized by the decree itself. *Williams v. Williams (In re Williams)*, 703 F.2d 1055, 1056 (8th Cir. 1983); *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604 (8th Cir. BAP 1997); *In re Larson*, 169 B.R. 945, 952 (Bankr.D.N.D.1994). Thus, the fact that in the decree under consideration the state court denoted the mortgage hold harmless as an aspect of the property settlement is irrelevant to the issue. It is well settled that the cardinal consideration in making the determination is the intent of the

parties and the function served by the obligation at the time of the divorce. This is a question of fact to be made by the court from a variety of factors without regard to the circumstances the parties may find themselves in subsequent to the divorce. *Boyle v. Donovan,* 724 F.2d 681, 683 (8th Cir.1984); *In re Sateren,* 183 B.R. 576 (Bankr.D.N.D. 1995). Frequently, as in the case at bar, a division of marital property is often employed as a substitute for alimony by providing a means for the disadvantaged spouse to maintain the basics of living for herself and dependents. In the case of *In re Osterberg,* 109 B.R. 938 (Bankr.D.N.D.1990) this court set forth a number of factors appropriate for consideration[1] and recently the Bankruptcy Appellate Panel for this Circuit in *Tatge, supra,* highlighted several of these, concluding that an agreement in that case to maintain mortgage payments was intended to serve the most basic of support functions—providing a home for a mother and children which they otherwise could not afford. 212 B.R. at 604. In the same vein, the court in *Williams* was presented with a debtor who, by stipulation, had agreed to pay joint debts owing banks, insurance companies and department stores. Noting that the debts were incurred to provide basic household necessities, the circuit, agreeing with the bankruptcy court, found the debtor's undertaking to pay those obligations to be in the nature of "support" for bankruptcy purposes. Similarly, an agreement or order providing for the assumption of a mortgage obligation by one spouse and a concomitant agreement to hold the other harmless may be regarded as in the nature of support if payment of the mortgage is necessary in order for the non-debtor spouse to maintain basic necessities—in this case housing.

It is clear from the state court opinion that foremost in that court's mind in awarding Dee the house and constructing the hold harmless remedy was to preserve the home for her and the minor children. Obviously, the home was essential not only for the safe rearing of the four minor children but also as a method of affording Dee a means of earning her livelihood. The failure by Klay to pay this debt would have exposed Dee to liability and possible loss of the family's only residence to foreclosure. This foreseen result very nearly happened in this case proving the point. Furthermore, the presence of minor children suggests that the obligation was the functional equivalent of support. Maintaining the family home for the welfare and benefit of the family is indicative of support as opposed to a mere property division. Assumption of the mortgage debt allowed this support feature to exist without fear of foreclosure.

Although Klay dwells on his lack of income and employment opportunities and the state court noted his poor income history, the state court also regarded him as capable of providing substantial support. Moreover, and doubtless in recognition of his experience and ability, he was awarded all of the income-producing assets against which there was only minimal debt at the time. Dee, on the other hand, burdened with the daily responsibility for four minor children of her own and a 24 hour day care, was given a home with a substantial mortgage—one she could not possibly pay from her income at the time. Although at the time of the divorce the parties' actual income was similar, their earning potential was by no means similar. Klay, possessed of many talents and having daily burdens infinitely less than Dee's, had a substantially greater earning potential. This court is persuaded that irregardless of how

1. In *Osterberg* the court assembled a panoply of factors appropriate to the consideration: (1) the age, health, educational level, skills, earning capacity and other resources of the respective parties; (2) whether there were minor children involved; (3) whether the obligation balances disparage incomes of the parties; (4) whether there was a need for support at the time necessary to provide for the daily needs of the recipient and any children; (5) whether a support or maintenance obligation also exists; (6) whether any other support award would be inadequate absent the obligation in question; (7) whether one party relinquished a right to support under state law in exchange for the obligation; (8) whether the obligation terminated upon death or remarriage of the recipient; (9) whether the obligation extended over time or is in a lump sum; (10) how the obligation is characterized under state law; (11) tax treatment of the obligation. (citations omitted).

characterized by the state court, the assumption of the mortgage obligation and the agreement to hold Dee harmless from any related debt was intended as support.

Therefore, and in consideration of the foregoing factors, the court concludes that Klay's obligation to pay the Security Bank of Hebron mortgage and hold Dee harmless from any unsatisfied balance was intended to be and is in the nature of support. Section 523(a)(15) argued in the alternative, will not be addressed as it applies only to debts not otherwise found to be in the nature of support or maintenance.

Based on the foregoing **IT IS ORDERED** that the unsatisfied mortgage balance represented by the supplemental money judgment in favor of the Plaintiff, Devonna Dee Kubik, and against the Defendant/Debtor, Klayton Kubik, in the principal amount of $29,591.76 together with interest at the judgment rate of interest from and after July 30, 1996, is nondischargeable pursuant to section 523(a)(5).

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**